# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-3323
_____

TooBaRoo, LLC; InfoDeli, LLC; Breht C. Burri

*Appellant*s

v.

Western Robidoux, Inc.; CEVA Animal Health, LLC; Boehringer Ingelheim
Animal Health USA Inc.

*Appellee*s
_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph
_____

Submitted: September 26, 2024
Filed: May 5, 2025
_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.
_____

KELLY, Circuit Judge.


After filing for bankruptcy, Western Robidoux, Inc. (WRI) brought adversary proceedings against Boehringer Ingelheim Animal Health USA, Inc. (BIVI) and CEVA Animal Health, LLC (CEVA). BIVI and CEVA then filed counterclaims and collectively sought upwards of $1.9 million in damages from WRI. Eventually the parties agreed to mediation and reached a settlement. Of WRI's many creditors, only

TooBaRoo, LLC,[1] objected to the settlement. The bankruptcy court[2] overruled TooBaRoo's objections and approved the settlement agreement. The district court[3] affirmed the bankruptcy court. TooBaRoo now appeals.

I.

This bankruptcy adversary proceeding relates to state and federal litigation initially brought by TooBaRoo against WRI, BIVI, and CEVA. See TooBaRoo, LLC v. W. Robidoux, Inc., 614 S.W.3d 29 (Mo. Ct. App. 2020); InfoDeli, LLC v. W. Robidoux, Inc., Nos. 20-2146, 20-2256, 23-2545, -- F.4th -- (8th Cir. May 5, 2025). BIVI and CEVA, both animal health product companies, were longtime clients of WRI, a commercial printing and fulfillment company. As part of their business arrangements with WRI, BIVI and CEVA each entered into service contracts that included provisions whereby WRI agreed to indemnify and defend the companies against certain liabilities and claims. When TooBaRoo sued the three companies, BIVI and CEVA demanded WRI indemnify them in the federal litigation. WRI agreed to these demands and made payments to both.

In 2019, in the midst of its litigation with TooBaRoo, WRI filed a voluntary petition in the United States Bankruptcy Court for the Western District of Missouri seeking Chapter 11 relief. In November 2020, BIVI and CEVA, two of WRI's largest creditors, filed administrative expense claims pursuant to 11 U.S.C.

---

[1]TooBaRoo, also known as InfoDeli, LLC, is solely owned by Breht Burri. Collectively, Burri and his two companies constitute the objecting creditor in this case.

[2]The Honorable Brian T. Fenimore, Bankruptcy Judge for the United States Bankruptcy Court for the Western District of Missouri.

[3]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

§ 503(b)(1)(A), (b)(3)(D), and (b)(4).[4] BIVI's application requested $561,215.11 and CEVA's requested $398,863.14.

In early 2021, WRI filed adversary claims against BIVI and CEVA alleging the indemnity payments were recoverable in bankruptcy. Several months later, WRI converted its Chapter 11 case to a Chapter 7 liquidation, and Jill Olsen (Trustee) was appointed trustee for the estate. Thereafter, the Trustee amended the adversary claims, alleging avoidance of fraudulent transfers under 11 U.S.C. §§ 548 and 544, as well as the Missouri Uniform Fraudulent Transfer Act, R.S.Mo. §§ 428.005, et seq. She also included claims for indemnity and money had and received.[5] BIVI and CEVA in turn filed counterclaims for breach of contract, breach of the duty of good faith and fair dealing, and setoff. BIVI sought $1.5 million in damages, while CEVA sought $398,863.14 in damages.

---

[4]Administrative expenses include "the actual, necessary costs and expenses of preserving the estate including—(i) wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). This includes "the actual, necessary expenses . . . incurred by—a creditor . . . in making a substantial contribution in a case under chapter . . . 11 of this title." Id. § 503(b)(3)(D). Administrative expenses have priority over all other claims relevant to this appeal. 11 U.S.C. § 507(a)(2).

[5]Under Missouri law, an action for money had and received "is appropriate where the defendant received money from the plaintiff under circumstances that in equity and good conscience call for the defendant to pay it to the plaintiff." Pitman v. City of Columbia, 309 S.W.3d 395, 402 (Mo. Ct. App. 2010) (quoting White v. Camden Cnty. Sheriff's Dep't, 106 S.W.3d 626, 634 (Mo. Ct. App. 2003)). "An action for money had and received 'lies for restitution of money that belongs in good conscience to the plaintiff, but was obtained by the defendant by duress or other means making it unjust for the defendant to keep the money.'" Id. (quoting same). The elements of a money had and received claim "are: (1) the defendant received or obtained possession of the plaintiff's money; (2) the defendant thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the money was unjust." Id.

In September 2021, BIVI and CEVA filed proofs of claim. BIVI's proof of claim alleged that WRI owed it $1,569,814.86. Specifically, BIVI asserted $693,796.61 as priority claims and $876,018.05 as unsecured. CEVA's proof of claim asserted a $398,863.14 priority claim.

In 2022, after extensive discovery in the adversary proceedings, during which the parties retained financial experts, the Trustee, BIVI, and CEVA agreed to enter mediation with Judge Barry Schermer of the United States Bankruptcy Court for the Eastern District of Missouri. The Trustee's decision to enter mediation was the result of two significant developments in the adversary proceedings. First, after BIVI and CEVA filed their counterclaims, the Trustee's outlook on the success of the estate's adversary action changed in part because of the increase in the dollar amount of the two creditors' counterclaims. The second was evidence in the form of a letter from WRI's attorney. In this letter, the attorney provided assurance to BIVI and CEVA that WRI would "indemnify and defend . . . against any copyright infringement claim or other claim raised in the InfoDeli" federal litigation, lending strong support to BIVI and CEVA's breach of contract counterclaims and undermining the estate's own claims. In addition, two of the estate's key witnesses—Cindy and Connie Burri—were unavailable to testify.

After a day of mediation, the Trustee reached a settlement with BIVI and CEVA, who both agreed to drop their counterclaims and administrative expense claims. According to the Trustee, the proposed settlement would extinguish more than $1.5 million in priority claims and nearly $900,000 in general unsecured claims, which benefited all other unsecured creditors. As a result, the Trustee determined that the settlement was the preferred option for the estate and all unsecured creditors.

The Trustee submitted the settlement proposal to the bankruptcy court. See Bankr. R. 9019. The only creditor to object was TooBaRoo, who argued it was in the best interest of the estate and its creditors that the estate, BIVI, and CEVA litigate their claims rather than settle. After an evidentiary hearing, the bankruptcy court overruled TooBaRoo's objections and approved the settlement agreement.

TooBaRoo appealed the bankruptcy court's decision to the district court. The district court affirmed, and TooBaRoo now appeals to us.

II.

A.

"As the second reviewing court, we apply the same standards of review that the district court applied[.]" Tri-State Fin., LLC v. Lovald, 525 F.3d 649, 653 (8th Cir. 2008) (quoting In re Clark, 223 F.3d 859, 862 (8th Cir. 2000)). We review the bankruptcy court's approval of a settlement made pursuant to Bankruptcy Rule 9019 for abuse of discretion. Id. at 654–55; In re Trism, Inc., 282 B.R. 662, 666 (B.A.P. 8th Cir. 2002). "The bankruptcy court abuses its discretion when its decision relies upon a clearly erroneous finding of fact or fails to apply the proper legal standard." Ritchie Cap. Mgmt., L.L.C. v. Kelley, 785 F.3d 273, 278 (8th Cir. 2015) (quoting Ritchie Special Credit Invs., Ltd. v. U.S. Trustee, 620 F.3d 847, 853 (8th Cir. 2010)).

The Trustee bears the burden of proving by a preponderance of the evidence that "the settlement is fair and equitable and in the best interests of the estate." Lovald, 525 F.3d at 654 (quoting In re Martin, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997)); see also In re Y-Knot Constr., Inc., 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007). The settlement need not be "the best result obtainable." Lovald, 525 F.3d at 654; see also Kelley, 785 F.3d at 278. Instead, to approve a settlement, "[t]he court need only ensure 'the settlement does not fall below the lowest point in the range of reasonableness,'" Kelley, 785 F.3d at 278 (quoting Lovald, 525 F.3d at 654), keeping in mind it "does not substitute its judgment for that of the trustee," In re Martin, 212 B.R. at 319; see also In re Trism, 282 B.R. at 667 (explaining bankruptcy courts are "limited to determining whether the proposed settlement is reasonable under the circumstances after a review of the relevant factors"). To determine whether a settlement is reasonable, courts consider the following factors:

(A) the probability of success in the litigation;
(B) the difficulties, if any to be encountered in the matter of collection;
(C) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(D) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Lovald, 525 F.3d at 654 (alteration omitted) (quoting In re Martin, 212 B.R. at 319).

On appeal, TooBaRoo argues that the bankruptcy court abused its discretion with respect to all four Lovald factors.

B.

The bankruptcy court concluded that the first Lovald factor—the likelihood of success in litigating the estate's claims—weighed in favor of settlement. See Lovald, 525 F.3d at 654. As an initial matter, the court observed that a key issue in the fraudulent transfer claim—whether WRI was insolvent or had unreasonably small capital during the relevant period—was "hotly contested." See 11 U.S.C. § 548(a)(1)(B)(ii)(I)–(II) ("The trustee may avoid any transfer . . . if the debtor . . . received less than a reasonably equivalent value in exchange for such transfer or obligation; and . . . was insolvent . . . or . . . any property remaining with the debtor was an unreasonably small capital[.]"); see also In re S. Health Care of Ark., Inc., 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004).

The court also considered the Trustee's uncontested evidence that WRI received reasonably equivalent value[6] from BIVI and CEVA, its two largest

_____

[6]See In re S. Health Care of Ark., Inc., 309 B.R. at 319 ("To succeed on a claim under 11 U.S.C. § 548(a)(1)(B)(i), the Chapter 7 Trustee must demonstrate, by a preponderance of the evidence, that payments a debtor made were not in exchange for reasonable equivalent value. 'This requires analysis of whether: (1) value was given; (2) it was given in exchange for the transfers; and (3) what was

-6-

customers, for its indemnification payments. The court observed that "WRI made the indemnification payments to keep its two largest customers sufficiently happy or satisfied that they would continue doing business with WRI despite the ongoing litigation, and it worked." Indeed, during the relevant time period, BIVI and CEVA generated business revenues for WRI equaling 9.5 times the indemnification payments, with gross profits equaling roughly 450 percent of those payments. The court explained that "in light of these seemingly rich returns on the indemnification payments, whether WRI had a contractual obligation to make the indemnification payments . . . [l]ikely does not matter." Based on these uncontested figures, the bankruptcy court concluded that even if WRI was insolvent for purposes of its fraudulent transfer claim, the Trustee would likely be unable to show that WRI received less than reasonably equivalent value for its indemnity claims and thus would not prevail at trial.

Regarding the contractual counterclaims, the court heard testimony from the Trustee that after she learned of the letter from WRI's attorney promising to indemnify BIVI and CEVA, her view of success at trial materially changed. The Trustee concluded that any potential distribution to the estate's other creditors was diminished given the likelihood that BIVI and CEVA would obtain judgments for priority claims. Likewise, WRI conceded in separate federal court proceedings that it intended to make indemnity payments to BIVI and CEVA—a concession that directly contradicted the estate's money had and received claim, which was predicated on WRI's assertion that it was forced into the arrangement. Further diminishing the estate's chance of success at trial was the fact that Connie and Cindy Burri were unavailable to testify, leaving the Trustee "[w]ithout competent witnesses." The Trustee testified that these developments left her with serious doubts that she would be able to meet her burden of proof; in her view, the estate had a 10

---

transferred was reasonably equivalent to what was received.' The payment of money is unquestionably the giving of 'value.'" (citation omitted) (first quoting In re Richards & Conover Steel, Co., 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001); and then quoting 11 U.S.C. § 548(d)(2)(A))).

percent chance of succeeding on the fraudulent conveyance claim and a zero percent chance of succeeding on the indemnity and money had and received claims.

On appeal, TooBaRoo fails to identify any evidence that would contradict or undermine the strong showing that the estate was unlikely to succeed on its adversary claims. Rather, TooBaRoo hypothesizes that the estate could have raised different claims. The estate did bring other claims, which were either abandoned or amended to bolster the estate's case. TooBaRoo has failed to show how the bankruptcy court abused its discretion for refusing to credit the likelihood of success for undeveloped or unspecified claims.

TooBaRoo also contends that the bankruptcy court's opinion was fatally flawed due to incomplete evidence—namely, that the Trustee disclosed only BIVI and CEVA's financial expert's report but not the Trustee's own, and that this limited the court's ability to adequately assess the merits of potential litigation. But TooBaRoo does not explain why the Trustee's report was necessary or provide legal authority to support the proposition that it had to be disclosed. See Heuton v. Ford Motor Co., 930 F.3d 1015, 1023 (8th Cir. 2019) ("[W]e regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities." (quoting Watson v. O'Neill, 365 F.3d 609, 615 (8th Cir. 2004))).[7]

The bankruptcy court did not abuse its discretion in finding that the likelihood of success at trial weighed in favor of settlement.

---

[7]TooBaRoo's argument that BIVI and CEVA were not entitled to indemnifications "as a matter of law," see Mary Ellen Enters. v. Camex, Inc., 68 F.3d 1065, 1072 (8th Cir. 1995) (affirming denial of copyright infringer's indemnification claim because they had been found to have "committed [a] wrong"), is foreclosed by our ruling in InfoDeli, LLC v. W. Robidoux, Inc., Nos. 20-2146, 20-2256, 23-2545, -- F.4th -- (8th Cir. May 5, 2025) (affirming grant of summary judgment to WRI, CEVA, and BIVI on TooBaRoo's federal copyright infringement claim).

C.

The bankruptcy court then turned to the remaining <u>Lovald</u> factors. The court concluded that the second factor—any difficulty in collecting the judgment from BIVI and CEVA—was neutral. <u>See</u> <u>In re Hason Industries, Inc.</u>, 88 B.R. 942, 949 (Bankr. D. Minn. 1988). The Trustee explained that she would have no difficulty collecting any judgment from BIVI and CEVA, and thus from the estate's standpoint, the Trustee did not need to "adjust[] the settlement amount to account for [BIVI and CEVA's] inability to pay." As to the third <u>Lovald</u> factor, the bankruptcy court cited the complexity of the claims, the thousands of pages of discovery that had already been produced, and the fact that the litigation required expert testimony, all of which would only increase the costs to the estate if the litigation continued. And the court noted that BIVI and CEVA would likely appeal any unfavorable trial verdict, which would threaten the estate with additional attorney's fees and expenses that "could outweigh the value of any judgment in the estate's favor." A settlement, in contrast, would resolve the claims, provide money to the estate, and eliminate 60 percent of the estate's claims.[8] We see no abuse of discretion in how the bankruptcy court weighed these two factors.

Regarding the fourth <u>Lovald</u> factor—"the paramount interest of the creditors"—the court addressed TooBaRoo's argument that "the general unsecured creditors without priority are the only creditors that matter." The court explained that this was "[n]ot true" because the Trustee's duty "runs to all creditors," including "unsecured creditors who are entitled to priority status, for example, under Sections 503 and 507 of the Bankruptcy Code." On appeal, TooBaRoo argues that BIVI and CEVA are not creditors at all and thus should not have been factored into the court's

---

[8]TooBaRoo asserts that the potential value of the claims eclipses any litigation costs, in part because TooBaRoo's counsel would provide representation at no cost to the estate. Putting aside the bankruptcy court's finding that the strong likelihood of failure overshadowed any potential recovery, TooBaRoo has provided no explanation for how it could provide adequate legal services to the estate given its adversarial posture in the related federal proceedings.

analysis. But parties who hold Section 503 administrative expense claims—here, BIVI and CEVA—are creditors, and they must be paid before other general unsecured creditors. 11 U.S.C. §§ 507, 726(a). Contrary to TooBaRoo's assertion, the bankruptcy court also did not improperly treat any attorney as a creditor when assessing the proposed settlement. In short, TooBaRoo's argument that the bankruptcy court erred as a matter of law in determining "who constitutes a creditor" for purposes of the proposed settlement is unavailing.

After carefully considering the proposed settlement, the bankruptcy court determined that it would reduce payments to priority creditors, which in turn would make more available to distribute to the unsecured creditors. The court also concluded that the settlement was neither fraudulent nor collusive—it was the result of arm's-length bargaining during a day-long mediation presided over by a highly respected federal judge—and noted that TooBaRoo was the only one out of a "long list of creditors" who objected to the settlement.[9] We see no abuse of discretion in the bankruptcy court's determination on this final factor.

III.

In the end, the bankruptcy court concluded that the settlement was "well within the range of reasonableness and that the settlement [was] fair and equitable and in the best interest of the WRI bankruptcy estate and should be approved." The court considered the relevant factors, and did not abuse its discretion, in reaching this conclusion.

We affirm.

———————————————

[9]According to the court, TooBaRoo also "ma[de] it abundantly clear that they wish[ed] to derail the proposed settlement hoping to gain leverage over some of the other parties" in an effort to gain favorable results in other causes of action. TooBaRoo does not meaningfully counter this finding.